**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**MELVIN J. PROCTOR, et al.**                    *

      Plaintiffs,

    v.                                                   *                    CIVIL ACTION No. RWT-07-1957

**METROPOLITAN MONEY STORE**           *
**CORP, et al.**

      Defendants.

                          *****

<u>**MEMORANDUM OPINION**</u>

Plaintiffs brought this action against numerous Defendants, who are legal entities and persons associated with them, who are alleged to have been involved in a mortgage foreclosure rescue scam.  Plaintiffs allege that their status as homeowners with substantial equity in their homes, but who were nevertheless facing foreclosure, made them targets of Defendants' promise of credit repair and foreclosure avoidance, which, in actuality, involved fraudulent representations and transactions designed to siphon off the equity in the homeowners' homes, thus leaving them in a far worse position than before.

This matter has come before the Court on numerous occasions and, thus, the Court need not repeat the entire factual and procedural of the case.  *See Proctor v. Metro. Money Store Corp.,* 579 F. Supp. 2d 724 (D. Md. 2008).  Rather, the pertinent procedural history is that on September 30, 2008, the Court issued a Memorandum Opinion [Paper No. 143] that dismissed all counts of the Plaintiffs' First Amended Complaint against Defendants Alexander J. Chaudhry and Ali Farahpour and granted Plaintiffs leave to file a Second Amended Complaint against those Defendants along with a renewed motion to certify a class against the Defendants, appoint a class representative, and appoint class counsel.  *Id.*  In dismissing the First Amended

Complaint in general against Farahpour and Count VII against Chaudhry, the Court found that the Plaintiffs had not sufficiently alleged what each of those Defendants had done to fulfill their respective roles in the scheme. *Id.* at 744-45.

Plaintiffs filed their Second Amended Complaint [Paper No. 150] on November 14, 2008, along with their Amended Motion to Certify Class [Paper No. 151]. On January 9, 2009, Chaudhry and Farahpour filed their Motions to Dismiss the Second Amended Complaint as well as their Motion to Stay Class Proceedings and Opposition to the Plaintiffs' Amended Motion to Certify Class [Paper Nos. 162, 163, 164, & 165], which were opposed by the Plaintiffs [Paper No. 175].

On January 22, 009, Chaudhry and Farahpour filed Counterclaims against the Plaintiffs for fraud, fraudulent concealment, negligent misrepresentation, fraudulent misrepresentation, and civil conspiracy to commit mortgage fraud. [Paper No. 166]. Plaintiffs moved to dismiss and strike the Counterclaims [Paper Nos. 166 & 171], which Chaudhry and Farahpour opposed [Paper Nos. 173 & 174].

A hearing was held on July 6, 2009 on all of the pending motions, and on the following day, the Court entered an order filed on July 8, 2009 that disposed of all of the motions for reasons stated on the record and "that will follow in an opinion to be filed." The Court now enters that Opinion.

## <u>ANALYSIS</u>

Chaudhry and Farahpour have moved to dismiss the Second Amended Complaint on the following grounds: (1) Plaintiffs have failed to plead fraud with the particularity that is required under Fed. R. Civ. P. 9(b); and (2) Plaintiffs have failed to state a claim for RICO (Counts I-III),

RESPA (Count IV), PHIFA (Count V), and gross negligence (Count VI) against Chaudhry and Farahpour.

## I.      Standard of Review

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) tests the sufficiency of the complaint.  *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  In *Bell Atlantic Corp. v. Twombly*, — U.S. —, 127 S.Ct. 1955, 1969 (2007), the Supreme Court declared the "retirement" of the long-cited "no set of facts" standard first announced in *Conley v. Gibson*, 355 U.S. 41 (1957).[1]  The Court in *Twombly* looked instead to whether the Petitioner alleged "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 1974 (observing that "[p]etitioner's obligation to provide grounds for his entitlement to relief requires more than labels and conclusions, and formalistic recitation of the elements of a cause of action will not do").  In sum, "factual allegations must be enough to raise a right to relief above a speculative level."  *Id.* at 1965; *see also Ashcroft v. Iqbal*, No. 07-1015, 556 U.S. ____, slip op. at 14-15 (May 18, 2009) (holding that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

No matter the standard used, the Court must consider all well-pled allegations in a complaint as true, *see Albright v. Oliver*, 510 U.S. 266, 268 (1994), and must construe factual allegations in the light most favorable to the plaintiff, *see Lambeth v. Bd. of Comm'rs of Davidson County*, 407 F.3d 266, 268 (4th Cir. 2005).  Nevertheless, the Court is not required to accept as true "a legal conclusion couched as a factual allegation," *Papasan v. Allain*, 478 U.S. 265, 286 (1986), conclusory allegations devoid of any reference to actual events, *United Black*

---

[1] *Conley* stated that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the Petitioner can prove no set of facts in support of his claims which would entitle him to relief."

*Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979), or "allegations that are merely conclusory, unwarranted deductions of fact or unreasonable inferences," *Veney v. Wyche*, 293 F.3d 726 (4th Cir. 2002).

## II.    The Requirement of Federal Rule of Civil Procedure 9(b) that Fraud Be Pleaded with Particularity

Chaudhry and Farahpour argue that Plaintiffs have still not cured the deficiencies present in their prior two complaints because the Second Amended Complaint fails to plead the alleged fraud committed by those two Defendants with the requisite degree of particularity required under Fed. R. Civ. P. 9(b).

Fed. R. Civ. P. 9(b) provides that "[i]n alleging fraud . . . a party must state with particularity the circumstances constituting fraud . . . ."  In alleging fraud, the complaint must allege the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."  *Harrison v. Westinghouse Savannah River Co.,* 176 F.3d 776, 784 (4th Cir. 1999).

When mail and wire fraud are asserted as predicate acts in a civil RICO claim, each must be pled with particularity, pursuant to Rule 9(b). *See Scott v. WFS Fin., Inc.*, Civil Action No. 2:06cv349, 2007 WL 190237, at *5 (E.D.Va. Jan. 18, 2007) (citing *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir.1989)). "Rule 9(b) requires pleading the time, place, and content of the false representations, the person making them, and what that person gained from them." *Id.* (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir.1999)). "However, '[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which he

will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts.' " *Id.*

Both mail and wire fraud have similar core elements that must be proven: (1) defendant's knowing participation in a scheme to defraud; and (2) the mails or interstate wire facilities were used in the furtherance of the scheme, but they need not be an essential element of the scheme. *Choimbol v. Fairfield Resorts, Inc.,* 428 F. Supp. 2d 437, 443 (E.D. Va. 2006); *United States v. ReBrook*, 58 F.3d 961, 966 (4th Cir. 1995). A "scheme to defraud" includes "a scheme or artifice to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. The mailings or wirings do not have to contain the misrepresentations that defrauded the plaintiff, but must merely be in furtherance of the fraudulent, material misrepresentation upon which the plaintiff relied to his detriment and may even include mailings and wirings directed at nonparties. *Kerby v. Mortgage Funding Corp.,* 992 F. Supp. 787, 798-99 (D. Md. 1998); *GE Investment Private Placement Partners II v. Parker*, 247 F.3d 543, 548-49 (4th Cir. 2001).

In a factually analogous case, the United States District Court for the Eastern District of Virginia held that plaintiffs, who brought an action arising out of a alleged mortgage foreclosure rescue scam, met the particularity requirement of Rule 9(b) in the complaint's allegations regarding the predicate acts of mail and wire fraud. *Williams v. Equity Holding Corp.,* 498 F. Supp. 2d 831, 842 (E.D. Va. 2007). Specifically, the district court noted that plaintiffs' "broad alleg[ations]" that defendants used the mails and interstate telephone system "in furtherance of said pattern of racketeering activity and collection of unlawful debt and to otherwise defraud plaintiffs" coupled with plaintiffs' recitation of an "outline [of] the alleged scheme to defraud them of their home and pled a time frame for the scheme, specific persons, entities, and times connected with the fraud, and the general contents of the alleged fraudulent communications

between defendants and the Williams" sufficed to meet the requirements of Rule 9(b).   The district court found that these factual allegations sufficed "to put defendants on notice of the circumstances for which they will have to prepare a defense." *Id.*

Similarly here, Plaintiffs have met Rule 9(b)'s requirement of particularity.   First, Plaintiffs have pleaded the predicate acts of mail and wire fraud with particularity against the background of a grand mortgage foreclosure rescue scam that involved the sale and leaseback of Plaintiffs' properties from which Chaudhry and Farahpour among others would siphon off and transfer the equity illegally.   Second Am. Compl. ¶¶ 1, 8, 107, 137, 151.   The Second Amended Complaint details "the issuance of false and deceptive HUD-1 settlement statements and other loan documents and instruments, fraudulent and false correspondence, and bank wired monies." Second Am. Compl. ¶ 237.   It also provides detailed examples for each of the named plaintiffs that include dates (and time stamps down to the hundredths of a second, in some cases), locations, documents, exact monetary figures, and details about the alleged acts undertaken by Chaudhry and Farahpour among others. For the sake of brevity, the allegations concerning the Simon Family provide a representative[2] sample of the level of detail pleaded in the Second Amended Complaint:

> • "The transfer of title to the Simon property and the settlement and closing
>   of the New Century loans was accomplished through the use of the U.S.
>   Mail.   Additionally the transaction made use of electronic wires.

---

[2] Allegations concerning the Proctor Family can be located at ¶¶ 81-110 of the Second Amended Complaint, the Simon Family at ¶¶ 111-156, and allegations concerning the other properties at issue can be located at ¶¶ 28-57.   The transactions involved the properties located at 8288 Dellwood, 9800 Huxley, 9603 Huxley Drive, 332 Carmody,  3443 Princess Graces Court, 9109 Doris Drive, 1835 Knoll, 8104 Ashford, 6048 Duckeys Run Road, 7995 Monarch, 1508 Robert Lewis Avenue, 5701 Butterfield Drive, 11567 Dunloring, 1411 Estelle Drive, 10700 Begonia Lane, 7533 Greenleaf Road, 78575 King Arthur Court, 4801 Fable Road, 17111 Livingston Road, 4209 56th Avenue, and 7602 Alloway Lane.   Notably, these allegations also contain exact monetary figures, dates, times, and descriptions of the acts undertaken by the Defendants.   Chaudhry and Farahpour are alleged to have supervised the fraudulent transactions, which included the preparation of fraudulent HUD-1 statements and wiring funds to parties other than those provided for in the HUD-1 statements. Second Am. Compl. ¶¶ 26, 28-57, 60, 77(e), 99, 138, 147, 152, 154, 178, 197-98, 212-13, 215, 220, 225, 228, 238, 245, 248-49, 255-56, 264(c), 272-73, 283-84.

Specifically, funds were wired to Sussex's accounts, controlled by Chaudhry, by New Century in two separate wires for Clark: (1) 1:40:05 p.m. and (2) 1:40:06 p.m on July 24, 2006." Second Am. Compl. ¶ 125.

- "Sussex wired proceeds from the transaction on at least two separate occasions to [MMS]'s account at SunTrust bank on July 26, 2006 in the amounts of $17,611 and $1,500 respectively. Upon information and belief, the wires from Sussex's bank account could only be approved or allowed by an authorized signer on Sussex's account which was Chaudhry and/or Farahpour." Second Am. Compl. ¶ 126.

- "The disbursement sheet prepared by Sussex for the transaction also shows a payment of $64,232 in the form of a wire transfer to the Simon Family . . . but this wire transfer was never made to the Simon Family." Second Am. Compl. ¶ 132.

- "The HUD-1 for the Simon Family's July 24, 2006 transaction shows that the remaining equity of more than $64,232.79 was all going to Simon, but Jackson, McCall, Mr. Fordham, [MMS] and F & F actually illegally took more than $64,232.79 of the Simon Family's money, as shown by a disbursement sheet. Jackson, McCall, Mr. Fordham, [MMS] and F & F were only able to obtain these funds through the complicity, concealment, and affirmative misrepresentations set forth in documents prepared in connection with the loans made to the straw purchaser. These documents included the Deed of Trust prepared by or under the supervision of Chaudhry that contained a representation as to occupancy, the HUD-1 that showed payment to Simon and the disbursement of funds made by checks signed by Defendant Chaudhry." Second Am. Compl. ¶ 131.

The Second Amended Complaint alleges that Chaudhry and Farahpour effectuated some of these mailings and wirings that would form the predicate acts of mail and wire fraud. Second Am. Compl. ¶¶ 199-202, 218, 224. Even though some of the mailings may have contained accurate information, the fact remains that *some* of the mailings contained fraudulent material. *United States v. Murr*, 681 F.2d 246, 248-49 (4th Cir. 1982) ("'The use of the mails need not in itself be fraudulent to constitute an offense under the statute' . . . the mailed material may be totally innocent, and yet it still may be found that a scheme to defraud exists.") (citation omitted).

Even a cursory review of the allegations involving the Simon Family reveals that Plaintiffs have more than surmounted the particularity threshold set out in Rule 9(b).  Plaintiffs have not only provided a general outline of the alleged mortgage foreclosure scheme that was intended to defraud them of their homes but they have also included specific dates and times that this scheme was alleged to have been conducted, the specific individuals and entities alleged to be responsible, and the specific fraudulent information communicated in written loan and title documents.  *Williams*, 498 F. Supp. 2d at 842.  Furthermore, the Second Amended Complaint describes how Farahpour and Chaudhry participated in the execution of the mortgage foreclosure rescue scam by supervising the fraudulent transactions with willful blindness, preparing false HUD-1 statements, by representing to the plaintiffs and class members that the transactions and supporting documents were accurate, and aiding and abetting the scheme by laundering the proceeds from the settlement transactions to make disbursements appear legitimate when, in fact, those disbursements were illegal and for different parties than those represented on the settlement documents, which permitted the other defendants to evade taxes.  Second Am. Compl. ¶¶ 26, 28-57, 60, 77(e), 99, 138, 147, 152, 154, 178, 197-98, 212-13, 215, 220, 225, 228, 238, 245, 248-49, 255-56, 264(c), 272-73, 283-84.   The Second Am. Compl. also alleges that the plaintiffs and class members relied upon the legitimacy and legality of the RICO enterprise to their detriment, and that the HUD-1 statements (which contained misrepresentations) contributed to the impression of legitimacy upon which they relied.  Second Am. Compl. ¶¶ 155, 207, 247, 250.  The plaintiffs were entitled to honest credit repair and refinancing services, to which they which they were deprived by this mortgage foreclosure rescue scam.  Undoubtedly, this puts Chaudhry and Farahpour "on notice of the circumstances for which they will have to prepare a defense."  *Id.*

Given the striking factual similarity between the case currently before this Court and the court in *Williams*, the Court finds that the Plaintiffs have fully satisfied their burden of pleading fraud with particularity in terms of the predicate acts of mail and wire fraud in support of the RICO claims (Counts I-III).

Moreover, Chaudhry and Farahpour are simply mistaken that Rule 9(b)'s requirement of particularity applies to the other elements of the RICO claims (e.g. existence of a conspiracy) *in addition to* the predicate acts of mail and/or wire fraud. *Williams*, 498 F. Supp. 2d at 842. For the remaining RICO elements and the remaining non-RICO claims, Plaintiffs' allegations are construed under the more liberal pleading standard of a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see also Baltimore County v. Cigna Healthcare,* 238 Fed. Appx. 914, 921 (4th Cir. 2007) (holding that the "notice pleading" standard of Fed. R. Civ. P. 8 applies to allegations of non-fraudulent conduct and thus plaintiff's claim of negligent misrepresentation did not need to be pleaded with particularity under Fed. R. Civ. P. 9(b)). Because the remaining claims in Plaintiffs' complaint do not allege fraudulent conduct (rather, they consist of the other elements of the RICO claims in addition to claims under RESPA, PHIFA, and a gross negligence claim), the lower pleading standard applies.

Plaintiffs have also sufficiently pleaded the other claims in the complaint with the requisite degree of particularity under either Rule 9(b)[3] or the lower threshold of "notice

---

[3]While the PHIFA and RESPA claims are not fraud claims in and of themselves, the Second Amended Complaint contains references to the "scam" or "scheme to defraud," and acts of Chaudhry and Farahpour that "deceived," and "fraudulent" the Plaintiffs that could be construed as averring fraud. *See* Second Am. Compl. ¶¶ 5, 143, 173, 179, 212, 213, 216, 224, 229, 237, 250, 263, and 293. In *Hershey v. MNC Fin., Inc.,* 774 F. Supp. 367, 375-76 (D. Md. 1991), this Court held that Rule 9(b) applies to "all averments of fraud" and that "its application should depend on the substance on a plaintiff's allegations, not upon the guise in which he portrays them." Assuming without deciding that the heightened particularity of Rule 9(b) applies, the Court finds that the Plaintiffs have also satisfied their burden of sufficiently pleading the merits of their non-RICO claims in the Second Amended Complaint because the Second

pleading" under Rule 8(a)(2), which is discussed in greater detail in the sections of the Opinion that follow.

### III.  Chaudhry and Farahpour's  Motions to Dismiss

Chaudhry and Farahpour contend that Plaintiffs have failed to state a claim upon relief can be granted on the following counts of the complaint.

As an initial matter, the Court notes that Chaudhry and Farahpour spill much ink on disputing the allegations in the complaint and offer their contradictory accounts of events.  While this may be relevant if this motion were one for summary judgment, this case is at the motion to dismiss stage, in which the Court must view the well-pleaded allegations as true and must construe factual allegations in the light most favorable to the Plaintiffs.  *Albright*, 510 U.S. at 268; *Lambeth*, 407 F.3d at 268.

### A.  Counts I - III: RICO

Chaudhry and Farahpour contend that the three RICO counts in the complaint should be dismissed because Plaintiffs have failed to state a claim.

Counts I through III of the Second Amended Complaint allege violations of RICO subsections (a)[4], (c)[5], and (d)[6].   18 U.S.C. § 1962(a), (c), and (d).  Chaudhry and Farahpour

---

Amended Complaint includes  dates, times, and specific details for the predicate events.  *A fortiori*, because Plaintiffs meet the heightened burden under Rule 9(b), they have undoubtedly met the lower threshold of "notice pleading" under Rule 8(a)(2).

[4]Subsection (a) "is aimed at the use of racketeering proceeds to infiltrate an enterprise."  *Benard v. Hoff*, 727 F. Supp. 211, 214 (D. Md. 1989).  The elements of subsection (a) claim are: (1) a receipt of income from a pattern of racketeering activity, and (2) use or investment of this income in an enterprise.  18 U.S.C. § 1962(a); *Busby v. Crown Supply, Inc.,* 896 F.2d 833, 837 (4th Cir. 1990).

[5]Subsection (c) "is aimed at the use of an enterprise to carry out racketeering activities."  *Benard*, 727 F. Supp. at 214.  The elements of a subsection (b) claim are: (1) conduct of or participation in (2) any enterprise (3) through a pattern (4) of racketeering activity.  18 U.S.C. § 1962(c); *Sedima S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985).

[6]Subsection (d) is aimed at conspiracies to violate subsections (a) through (c) of RICO.  18 U.S.C. § 1962(d).  To allege a subsection (d) claim, plaintiff must allege that "each defendant agreed that another coconspirator would commit two or more acts of racketeering."  *United States v. Pryba*, 900 F.2d 748, 760 (4th Cir. 1990).

10

contend that Plaintiffs have failed to plead allegations in support of the elements of "an enterprise," a "pattern," "racketeering activity," and injury to the plaintiff, which are necessary elements common to all three subsection claims.

Under Rule 9(b), a plaintiff's RICO claim based on predicate acts of mail and wire fraud must "[a]t a minimum . . . identify the time, place, contents, and speaker of the alleged misrepresentation, along with what was obtained by the statement."  *Orteck Int'l, Inc. v. TransPacific Tire & Wheel, Inc.*, Civ. No. DKC-05-2882, 2006 WL 2572474, *16 (D. Md. Sept. 5, 2006).  As discussed in greater detail above, the Plaintiffs here have satisfied Rule 9(b)'s requirement of particularity with regard to the predicate acts of mail and wire fraud.

In terms of the other elements of the RICO claims, the Court will address them in turn.

### 1.     Enterprise

An "enterprise" is defined under RICO as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).  An "enterprise" requires proof of three elements: (1) an ongoing organization; (2) associates functioning as a continuing unit (even if some leave as long as the organization remains the same); and (3) the enterprise is an entity separate and apart from the pattern of activity in which it engages. *United States v. Tillett*, 763 F.2d 628, 631 (4th Cir. 1985).

In this case, the Second Amended Complaint's allegations sufficiently allege an ongoing organization between all of the RICO defendants (Jackson, McCall, Fordham, MMS, F&F, Chaudhry, Farahpour, and Ballesteros).  Specifically, the Second Amended Complaint alleges that "[t]he enterprise consisted of an association in fact of the Defendants Jackson, McCall, Fordham, [MMS], F&F, Sussex, Chaudhry, Farahpour and Ballesteros, to implement and

conduct the "Foreclosure Reversal Program," which has been  operated over the course of at least a two-year period through the use of mail, wire, and tax fraud and the collection of unlawful debts, and involving hundreds of victims[, and e]ach Defendant willingly participated directly or indirectly in the operation of the enterprise."  Second Am. Compl. ¶ 172.  The Second Amended Complaint alleges that the defendants "had each previously set up, operated, invested in and conspired to create other illegal real estate related enterprises to conduct various settlement services that used a pattern of racketeering activity and the collection of unlawful debts to conduct its business," which included their conspiracy with one another to engage in illegal activities such as falsifying HUD-1 statements and other loan and title documents, failing to disclose statutorily-required information and documents to the Plaintiffs (i.e. regarding their rights to rescind), and misrepresenting the role that the defendants were playing (i.e. that they were siphoning off the equity in the properties rather than repairing the plaintiffs' credit and aiding them in avoiding foreclosure).  *See, e.g.,* Second Am. Compl. ¶¶ 211-31.

Despite Chaudhry's and Farahpour's contentions otherwise, the Second Amended Complaint sets forth the following factual allegations, all of which support a finding that the Second Amended Complaint sufficiently meets the "liberal notice pleading" standard of Rule 8(a)(2).  Though Chaudhry and Farahpour focus on the fact that the Second Amended Complaint does not allege that they "directed" the enterprise, proof of *participation* in the *operation* **or** *management* of the enterprise is *only* required.  *Reves v. Ernst & Young,* 507 U.S. 170, 185 (1993).

First, the organization of the enterprise is set forth as follows in the Second Amended Complaint:

- Jackson, McCall, Fordham, MMS, and F&F "solicited the business of the named Plaintiffs and other class members. Namely, Fordham and McCall arranged for "credit repair" for the named Plaintiffs and other class members. Second Am. Compl. ¶ 213.
- "Sussex, through the efforts of Chaudhry and Farahpour, which included directing Ballesteros, settled and closed the transactions of named Plaintiffs and the other members of the class, fraudulently facilitating and concealing the illegal transactions and channeling funds back to the other defendants Jackson, McCall, and Fordham, MMS, and F&F to launder funds and evade taxes." *Id.*
- The defendants' association with one another "served as the vehicle through which the unlawful acts described herein were conducted" and that "[w]ithout the association of these persons, the unlawful acts described herein would not have been possible." Second Am. Compl. ¶ 214.
- The enterprise among the defendants had "an organizational structure or chain of command, including phases for soliciting and recruiting victim homeowners, preparing contracts including sales contracts and leases, preparing loan documents, brokering loans, obtaining title insurance, settling and closing real estate transactions, falsifying distribution records to evade taxes and creating the appearance of a legitimate credit repair business." Second Am. Compl. ¶ 215.

In particular, Sussex's role (as well as those of Chaudhry, Farahpour, and Ballesteros) is described as follows:

- These transactions were settled and closed by Sussex, through the coordinated efforts of Ballesteros obtaining signatures on documents, Chaudhry and Farahpour paying Ballesteros to obtain signatures and other tasks, Chaudhry preparing documents or having them prepared under his supervision and Chaudhry or Farahpour authorizing disbursements from the transactions through checks or wires. The transactions included causing documents or disbursements to be sent through mail or wires. The transactions were settled and closed by Sussex for the enterprise and Sussex participated and functioned as part of the enterprise from its inception until about August 2006, closing hundreds of transactions as part of the enterprise. Second Am. Compl. ¶ 218.
- Sussex is alleged to been "the umbrella for the actions of Chaudhry, Farahpour and Ballesteros . . . [when they] prepared fraudulent settlement statements and closing documents for named plaintiffs and the other members of the class which were transmitted through the interstate mail and/or wires, and prepared improper documents purporting to permit Chaudhry and Farahpour to split proceeds of the settlement transactions that were to go to named plaintiffs and the other members of the class, to instead be paid to Jackson, McCall, Fordham, [MMS], F&F, which were also transmitted through interstate mail or wires." Second Am. Compl. ¶ 224.
- These false settlement statements, which misrepresented that the funds were to be paid to the named plaintiffs and class members (when they were in actuality paid

to other defendants) allowed Jackson, McCall, Fordham, MMS, and F&F to evade paying taxes on the funds they received from the scam.  Second Am. Compl. ¶ 225.

- Sussex, through Chaudhry and Farahpour facilitated the channeling of funds to F&F by authorizing wires or other disbursements, which in turn divided these funds among Jackson, McCall, Fordham, MMS, F&F, the straw buyers, and others "to further conceal the true nature of their enterprise."  Second Am. Compl. ¶ 227.

- The fraudulent HUD-1 settlement statements "implicates all of the defendants who received or disbursed funds as an additional kickbacks and illegal splits, oversaw the closings, and/or prepared closing documents, including the defendants Jackson, McCall, Fordham, MMS, F&F, Chaudhry, and Farahpour." Second Am. Compl. ¶ 229.

Farahpour's role is further alleged as controlling and operating an entity called Money Tree Funding that "brokered loans from various mortgage lenders, including New Century, for the straw purchasers who would take title to the homes of the named plaintiffs and the other members of the class."  Second Am. Compl. ¶ 222.

Second, the continuity of the alleged RICO enterprise is alleged sufficiently by the Second Amended Complaint as follows: the defendants "participated and engaged in the enterprise and functioned as continuing units identifiable over a period of time [and] . . . were involved in the transactions involving the named plaintiffs and other members of the class over a period spanning at least two years and involving at least a hundred transactions."  Second Am. Compl. ¶ 217.  The Second Amended Complaint alleges a myriad of repeat transactions.  Second Am. Compl. ¶¶ 28-57.

Finally, the Second Amended Complaint alleges a pattern of racketeering activity that is separate and apart from the enterprise.  The Second Amended Complaint alleges that "[o]n information and belief, the enterprises described above did not exist solely for the purpose of engaging in predicate acts violative of RICO, but the enterprises also engaged in legitimate real estate transactions over the same period of time for the purpose of further concealing the true

14

intent of their enterprise."  Second Am. Compl. ¶ 220.  *See United States v. Turkette,* 452 U.S. 576 (1981) (holding that proof of racketeering activity and proof of the existence of an enterprise may "coalesce" but are "separate element[s]" that must be proven.").

Given the level of detail that is pleaded in the Second Amended Complaint, especially when taken in context of the detailed factual allegations of the predicate acts of mail and wire fraud discussed above, the Court finds that the Second Amended Complaint has sufficiently alleged the element of an "enterprise."  The Second Amended Complaint has pleaded factual allegations that the defendants, including Chaudhry and Farahpour, engaged in an ongoing organization that continued as a functioning unit, in which Chaudhry and Farahpour concealed illegal transactions by their supervisory and management positions at Sussex Title, and that the enterprise existed separate from the pattern of  criminal activity itself.

### 2.    Pattern

The Plaintiffs must also prove the existence of a "pattern" of racketeering activity or the "collection of an unlawful debt" in order to satisfy this element of their RICO claims.  18 U.S.C. § 1962.

To prove a "pattern" of racketeering activity, there must be "at least two acts of racketeering activity" that occur within a ten-year period that are related and "amount to or pose a threat of continued criminal activity."  18 U.S.C. § 1961(5).  Predicate acts are "related" if they have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events. *Healthandbeautydirect.com v. Schulberg,* 2004 WL 2005783, at *2 (D. Md. Sept. 1, 2004). These acts may be committed by a variety of persons such that each defendant may not have direct participation in each act but evidence of those acts is relevant to the RICO charges against

each defendant because it tends to prove the existence and nature of the RICO enterprise. *United States v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992). The criminal activity does not need to be currently ongoing; rather it may be a "closed period of repeated conduct" or "past conduct that by its nature projects into the future with a threat of repetition." *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 241 (1989). The determination of whether a "pattern" of racketeering activity exists is a "commonsensical, fact-specific inquiry." *Id.* at 237-38; *Anderson v. Found. for Advancement, Educ., & Employmnet of Am. Indians,* 155 F.3d 500, 506 (4th Cir. 1998).

In this case, the Second Amended Complaint's allegations suffice to state a "pattern" of racketeering activity because it alleges (1) more than two predicate acts (in addition to the named plaintiffs, it alleges hundreds more); (2) that occurred over a substantial period of time (at least two years); (3) that were related (the acts were ones that had the similar purpose of siphoning off equity from distressed homeowners and the same methods of commission (misrepresenting the role that Sussex was going to take in ensuring that the settlement was legitimate, that the disbursements were transferred in accordance with the HUD-1 statements, that the HUD-1 and settlement documents were accurate, and that the settlement itself was a legitimate and proper transaction that purported to be what it advertised as [credit repair and foreclosure rescue] rather than what it was [equity siphoning off refinancing proceeds]); (4) that the predicate acts of mail and wire fraud were undertaken with the intent and in furtherance of the scheme; (5) that Chaudhry and Farahpour are alleged to have engaged in similar acts and predicate acts for several years spanning hundreds of transactions; (6) resulted in losses to the named plaintiffs and other class members of more than $60 million; and (7) this conduct was a "closed period of repeated conduct" that started in early 2005 and ended in mid-2006 and, but for the intervention

16

of law enforcement, would likely have "project[ed] into the future with a threat of repetition" as the named plaintiffs and other class members face foreclosure proceedings against their properties and the deleterious effect of defendants' actions on their credit histories.  Second Am. Compl. ¶¶ 1, 2, 28-57, 151, 155, 166, 250, 257.

In the alternative, the Second Amended Complaint also has sufficient factual allegations in support of the "collection of unlawful debts" to satisfy this element of a RICO claim.  Under RICO, an "unlawful debt" is defined as a debt that is

> (A) . . . unenforceable under State or Federal law in whole or in part as to the principal or interest because of the laws relating to usury, and (B) which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

18 U.S.C. § 1962(6).

Notably, an allegation of "collection of unlawful debts" requires only a single act of collection as a predicate for RICO liability.  *H.J. Inc.,* 492 U.S. at 232; *United States v. Weiner*, 3 F.3d 17, 23-24 (1st Cir. 1993).

Here, the Second Amended Complaint alleges multiple collections of unlawful debts in terms of the "sale-leaseback" arrangements that characterized the mortgage foreclosure rescue scam.  Indeed, the Second Circuit held in a factually-similar case involving a "sale-leaseback" arrangement that this arrangement could be characterized as a equitable mortgage.  *In re PCH Assocs.,* 940 F.2d 585 (2d Cir. 1991).  The Second Circuit held that

> mortgage financing and sale-leaseback structures are similar in several respects. In both transactions, the "borrower" retains possession of the property and is responsible for the maintenance and carrying costs thereof.  A mortgage financing transaction necessarily entails the loaning of money to the mortgagor, and a sale-leaseback may be viewed as a loan of the fee owner's property to the lessee.  The consideration paid in a mortgage financing transaction is denominated "interest,' and the consideration in a leasing transaction is called "rent."  At the expiration of

17

the term of the mortgage financing transaction, the mortgagee receives the balance of the funds loaned to the mortgagor; at the expiration of the lease term, the lessor receives possession of the real property which had been leased. A lessor under a true lease . . . and a mortgagee . . . are both accorded recourse to the subject property (among other remedies) for satisfaction of the obligations owing to them.

*Id.* (citing L. Cherkis, Collier *Real Estate Transactions and the Bankruptcy Code* ¶ 2.02[2], at 2-35 (1990)).

Similarly, Maryland law provides that

every deed which by any other writing appears to have been intended only as security for payment for an indebtedness or performance of an obligation, though expressed as an absolute grant is considered a mortgage. The person for whose benefit the deed is made may not have any benefit or advantage from the recording of the deed, unless every other writing operating as a defeasance of it, or explanatory of its being intended to have the effect only of a mortgage, also is recorded in the same records at the same time.

Md. Code Ann., Real Prop. § 7-101(a). The Court of Appeals of Maryland has held that a scheme in which the transfer of title to prevent foreclosure that permitted the seller to continue to occupy the property in exchange for monthly "rent" payments to the purchaser was a mortgage, not an absolute sale, under Maryland law. *Thomas v. Klemm,* 185 Md. 136, 140-41 (1945). The court there emphasized that

[t]he doctrine is firmly established that a conveyance, although purporting to be an absolute sale, and without any accompanying written defeasance, contract of repurchase, or other agreement, may be treated in equity as a mortgage as between the original parties and against all persons deriving title from the grantee who are not bona fide purchasers for value and without notice, if it is shown to have been intended merely as security for an existing debt or a contemporaneous loan.

*Id.* at 139.

Here, the Court similarly finds that the sale-leaseback provision constitutes a mortgage (loan) under Maryland law such that the allegedly high interest rates charged by Defendants constitute the collection of an "unlawful debt" under Maryland law because the loans made to

the named plaintiffs and other class members are alleged to be in excess of twice the usury limit in Maryland and plaintiffs were required to repay these loans at the end of one year or they would be evicted from their homes as their equitable mortgage would be foreclosed.  *See, e.g.* Second Am. Compl. ¶¶ 102, 133, and 230.

### 3.      Reinvestment of Income in the Enterprise

Another common element of a RICO claim is that the plaintiff must allege that the defendants received income from their pattern of racketeering activity and that they then used or invested this income in an enterprise.  *Busby,* 896 F.2d at 837.  A defendant may be liable if he committed the act directly, but also if he "aids, abets, counsels, commands, induces or procures its commission" or "willfully causes an act to be done.'  18 U.S.C. § 2.  The offender who commits the racketeering activity needs not be different from the enterprise in which the proceeds of that activity are invested and may be identical.  *Busby,* 896 F.2d at 841.

Here, the Second Amended Complaint sufficiently alleges that both Chaudhry and Farahpour received income from their involvement in the pattern of racketeering (or their collection of unlawful debts).  The Second Amended Complaint alleges that, due to its association with other RICO defendants, Sussex Title received "a large volume of referrals" and that it then charged "excessive fees," which benefitted both Chaudhry and Farahpour in addition to the commissions they received.  Second Am. Compl. ¶¶ 77(c), 226, 240.  The Second Amended Complaint alleges that Chaudhry and Farahpour reinvested these funds into Sussex and channeled fees to MMS and F&F, which were then reinvested in the mortgage foreclosure rescue scam, which then resulted in additional referrals to Sussex, Chaudhry, and Farahpour. Second Am. Compl. ¶¶ 68, 213, 226-27, 243, 283. In particular, these fees were channeled in the Simon and Proctor families' transactions such the proceeds from those settlement transactions

were laundered to make the disbursements to MMS and other Defendants appear legitimate when, in fact, those disbursements were illegal and for different parties than those represented on the settlement documents which permitted MMS and other Defendants to evade taxes and continue the scheme undetected.  Second Am. Compl. ¶¶ 96, 102, 132.  Moreover, Chaudhry and Farahpour were paid their income from Sussex as a result of these transactions.  Second Am. Compl. ¶¶ 1, 10, 16, 29.

Therefore, the Court finds that the Second Amended Complaint has stated a claim for this element of a RICO violation.

### 4.      Conspiracy

RICO also requires that the plaintiff allege and later prove that the defendants knew of the RICO violations of the enterprise and agreed to facilitate those activities.  18 U.S.C. § 1962(d).  Like other conspiracies, a defendant who agrees to do something illegal and opts into or participates in a conspiracy is liable for the acts of his co-conspirators even if the defendant did not agree to do or conspire with respect to a particular act.

Here, the Second Amended Complaint alleges that both Chaudhry and Farahpour were aware of the issues surrounding the propriety and legitimacy of the transactions that MMS was engaging in (which was before the transactions involving the Proctor family, other named Plaintiffs, and other class members) and that they were aware of the activities of their employee and subordinate Ballesteros in terms of the settlements he was conducting.  Second Am. Compl. ¶¶ 77, 78, 90-92, 96, 263.  The Second Amended Complaint further alleges that the RICO defendants, including Chaudhry and Farahpour, "associated together for a common purpose of engaging in a course of conduct, which was to engage in a scheme to strip equity, and that all of them "were aware of each other's existence as part of the scheme to defraud," and that Chaudhry

20

and Farahpour joined the scheme to "generate a large volume of referrals" for their settlement business from the other RICO defendants.  Second Am. Compl. ¶¶ 210, 212, 245-46.

The Second Amended Complaint alleges that both Chaudhry and Farahpour agreed to facilitate the RICO violations of the other defendants by supervising or making disbursements themselves that contradicted the disbursement schedule on the HUD-1 statements, which permitted the other RICO defendants to evade taxes on (and detection) the funds channeled to them from those settlements.  Second Am. Compl. ¶¶ 97-98, 102, 105-06, 125-26, 210, 212-13, 218.  The Second Amended Complaint also alleges that Chaudhry falsely informed Maryland Department of Labor Licensing and Regulation investigators that he had never audited Ballesteros's work or was aware that funds were being disbursed that were not in accordance with HUD-1 settlement statements or that Sussex had closed multiple repeat transactions in which the same straw purchasers were involved.  Second Am. Compl. ¶¶ 66-68, 78, 79.  Moreover, Chaudhry is alleged to have stated that Sussex and MMS had a business referral relationship and that he had meetings with Joy Jackson about that business relationship.  Second Am. Compl. ¶ 78.

Accordingly, the Court finds that the Second Amended Complaint has adequately pleaded the element of a conspiracy under RICO.

### 5. Injuries to Plaintiffs

Chaudhry and Farahpour contend that Plaintiffs have not properly alleged that they have suffered injury to their business or property as a result of the alleged predicate RICO activity by them.  They contend that intervening factors have broken the chain of proximate causation such that they should not be held liable for the Plaintiffs' injuries.  Specifically, they contend that

MMS's solicitation of the Plaintiffs caused the injuries rather than their actions at settlement. Moreover, they contend that Sussex's role in wiring the equity did not implicate either of them.

As noted earlier, this factual issue is best resolved at the summary judgment stage or at trial by the trier of fact.  In any event, the Second Amended Complaint alleges that the Plaintiffs were charged fees that should not have been charged and that they "had their equity rich homes stolen from them for illegal services by the enterprises."  Second Am. Compl. ¶¶ 208, 258, 265, 266, 274, 291, 303, 323.

Plaintiffs have met their burden under the liberal notice pleading standard of Rule 8(a)(2) of alleging their injuries in terms of the loss of their property and the resultant damage to their finances for compensatory damages.

### 6.    Conclusion

Given that the civil penalties available under RICO were enacted with the "explicit policy" that they be "liberally interpreted,"  *Busby v. Crown Supply, Inc.,* 896 F.2d 833, 838 (4th Cir. 1990), Plaintiffs have satisfied the heightened particularity requirements for Rule 9(b) with regard to the predicate acts of mail and wire fraud and have satisfied that standard for the remaining RICO elements and *a fortiori*, the more lenient "notice pleading" standard under Rule 8(a)(2).

### B.    Count IV: RESPA

Chaudhry and Farahpour contend that the Second Amended Complaint fails to state a claim against them under RESPA because they argue that: (1) the Proctors' RESPA claim is time-barred and the Second Amended Complaint did not plead sufficient facts to trigger the application of the doctrine of equitable tolling; (2) Chaudhry's participation in similar transactions with the other defendants (MMS, F&F, etc) over a period of time does not support

the inference that he was on notice that the transactions were referred pursuant to an agreement or understanding; (3) the "vast discrepancy" in the amount of money Chaudhry earned as a result of the scheme as compared to what MMS earned undermines a RESPA claim against him; and (4) there are no facts supporting the conclusion that they were affiliates or partners of the other named Defendants in the case such that a RESPA disclosure was required.

RESPA sought to provide consumers with a better understanding of the home purchase and settlement process, and to reduce, when possible, "unnecessarily high settlement charges caused by certain abusive practices."  12 U.S.C. § 2601.  RESPA prohibits certain business referrals and splitting of charges.  In particular, RESPA provides that

> (a) No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person.

> (b) No person shall give and no person shall accept any portion, split or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed.

12 U.S.C. § 2607(a)-(b).

A "settlement service" includes any service that is provided in connection with a real estate settlement.  12 U.S.C. § 2602(3).

A RESPA claim brought by a private litigant must be brought within 1 year from the date of the occurrence of the violation.  12 U.S.C. § 2614.  It is undisputed that the Proctors' settlement with Sussex occurred on January 24, 2006, but that they did not bring their case until July 24, 2007, which is outside of the one-year statute of limitations.

As a threshold matter, the Court must determine whether equitable tolling applies.  The doctrine of equitable tolling prevents a defendant from "concealing a fraud, or . . . committing a

23

fraud in a manner that it concealed itself until the defendant could plead the statute of limitatiojs

to protect it."   *Mullinax v. Radian Guar., Inc.,* 311 F. Supp. 2d 474, 487 (M.D.N.C. 2004)

(quoting *Supermarket of Marlington, Inc. v. Meadow Gold Diaries, Inc.,* 71 F.3d 119 (4th Cir.

1995)).   Thus, "when the fraud has been concealed or is of such a character as to conceal itself,

the plaintiff is not negligent or guilty of laches, the limitations period does not begin to run until

the plaintiff discovers the fraud."   *Id.*

The Second Amended Complaint alleges that because the Defendants concealed the true

nature of their scheme through the use of inaccurate HUD-1 statements, representations, and

other settlement and loan documents, Plaintiffs and other class members were prevented from

discovering or filing their claims.   Second Am. Compl. ¶ 170.   Indeed, the Second Amended

Complaint alleges that this scheme was so thorough and the transactional paperwork so

voluminous and complex (given the disbursements to the other defendants that occurred contrary

to the information stated in the HUD-1 statements) that Plaintiffs and other class members "did

not and could not reasonably learn from their transactions' correspondence the fact that the

Foreclosure Reversal Program was a sham and not operating according to law."   Second Am.

Compl. ¶ 196.

The argument by Chaudhry and Farahpour misses the mark as it concerns equitable

*estoppel* more so than equitable *tolling*.   The Court will adopt similar reasoning as that employed

by the United States District Court for the Western District of Washington in *Blaylock v. First

Am. Title Ins. Co.*, 504 F. Supp. 2d 1091, 1108 (W.D. Wash. 2007).   The *Blaylock* court

explained that though the defendants argued that equitable tolling "turned on a plaintiff's ability

to show that the defendant fraudulently concealed the actions that form the basis of the plaintiff's

claim . . . and [they] must allege some fraud on [d]efendants' part," defendants were in fact

addressing the doctrine of equitable estoppel.  *Id.*  The *Blaylock* court noted that the doctrine of equitable tolling "focuses on excusable delay by the plaintiff," "inquires whether 'a reasonable plaintiff would . . . have known of the existence of a possible claim within the limitations period," and *does not* depend on any wrongful conduct by the defendant.  *Id.* (internal citations omitted).

Here, the Court therefore finds that the doctrine of equitable tolling does not require proof (or allegations pleaded with particularity) of any wrongful conduct by the defendants. Applying the doctrine of equitable tolling, the Court finds that the doctrine should apply[7] because, as the Second Amended Complaint alleges, the disbursements were not made in accordance with the HUD-1 statements and the documents were not recorded in the manner in which the Plaintiffs were told, such that the Plaintiffs were reasonably unaware that the disbursements, loans, and title recording were different than what was represented, which supports a finding that their delay of over a year in bringing their RESPA claims is reasonable. Moreover, given the procedural posture of the litigation at this early motion to dismiss stage, the principles of equitable tolling should apply.

Turning to the merits of the RESPA claims, the Second Amended Complaint asserts a claim under subsection (a) of § 2607 alleging that Chaudhry and Farahpour were affiliated with MMS (as noted in Orig. Compl. Ex. 21, which demonstrated that Sussex was the "required settlement services provider" for title insurance and that MMS had a "relationship" with it) in terms of the settlement transactions involving the plaintiffs and other class members.  It also

---

[7]Other federal courts have applied the doctrine of equitable tolling to RESPA claims.  *See, e.g., Lawyers Title Ins. Corp. v. Dearborn Title Corp.,* 118 F.3d 1157, 1166-67 (7th Cir. 1997); *Carr v. Home Tech Co., Inc.,* 2007 WL 67837, at *8 (W.D. Tenn. 2007), *Mullinax v. Radian Guar. Inc.,* 199 F. Supp. 2d 311, 328 (M.D.N.C. 2002); *Pedraza v. United Guar. Corp.,* 114 F. Supp. 2d 1347, 1353 (S.D. Ga. 2000).  *But see Hardin v. City Title & Escrow Co.,* 797 F.2d 1037 (D.C. Cir. 1986).

alleges that they received valuable referral business and resulting commissions and income as a result of their participation in this scheme to funnel the equity in those properties to the other defendants.  Second Am. Compl. ¶¶ 282, 288.

Furthermore, the Second Amended Complaint states a claim under subsection (b) of § 2607 because Chaudhry and Farahpour are alleged to have split the fees and charges they received as a result of these real estate settlement transactions among themselves (and their employee Ballesteros) in addition to the other Defendants.  Second Am. Compl. ¶¶ 77, 224, 249, 280.

Finally, the RESPA qualified defense for "an affiliated business arrangement" does not apply in this case because the Second Amended Complaint alleges that Chaudhry and Farahpour were not "bona fide providers of settlement services" due to the inaccuracies and misrepresentations in the HUD-1 statements and other settlement documents.  *See* 12 U.S.C. § 2607(c)(4); *see also Benway v. Resource Real Estate Servs., LLC,* 239 F.R.D. 419, 423 (D. Md. 2006) (citations omitted).

Accordingly, the Court finds that the Second Amended Complaint states a claim under both subsections of RESPA.

**C.      Count V: PHIFA**

Chaudhry and Farahpour contend that Plaintiffs have failed to state a claim under PHIFA because their complaint alleges that other individuals acted as the foreclosure consultants (rather than Chaudhry and Farahpour themselves) and that Chaudhry and Farahpour did not know about the foreclosure contracts.

PHIFA applies to "foreclosure consultants, services, and purchasers."  Md. Code. Ann., Real Property § 7-301(b), (d), (e).    PHIFA requires that "foreclosure consultants" and

"foreclosure consulting services" provide a "foreclosure consulting contract" to the homeowner in foreclosure; this contract must fully disclose the exact nature of the foreclosure and the consulting services to be provided. *Id.* § 7-306(a); *Johnson v. Wheeler*, 492 F. Supp. 2d 492, 503 (D. Md. 2007).

A "foreclosure consultant" is defined as a person who:

(1) Solicits or contacts a homeowner in writing, in person, or through any electronic or telecommunications medium and directly or indirectly makes a representation or offer to perform any service that the person represents will:
    (i) Stop, enjoin, delay, void, set aside, annul, stay, or postpone a foreclosure sale;
    (ii) Obtain forbearance from any servicer, beneficiary or mortgagee;
    (iii) Assist the homeowner to exercise a right of reinstatement provided in the loan documents or to refinance a loan that is in foreclosure and for which notice of foreclosure proceedings has been published;
    (iv) Obtain an extension of the period within which the homeowner may reinstate the homeowner's obligation or extend the deadline to object to a ratification;
    (v) Obtain a waiver of an acceleration clause contained in any promissory note or contract secured by a mortgage on a residence in default or contained in the mortgage;
    (vi) Assist the homeowner to obtain a loan or advance of funds;
    (vii) Avoid or ameliorate the impairment of the homeowner's credit resulting from the filing of an order to docket or a petition to foreclose or the conduct of a foreclosure sale;
    (viii) Save the homeowner's residence from foreclosure;
    (ix) Purchase or obtain an option to purchase the homeowner's residence within 20 days of an advertised or docketed foreclosure sale; or
    (x) Arrange for the homeowner to become a lessee or renter entitled to continue to reside in the homeowner's residence after a sale or transfer; or

(2) Systematically contacts owners of residences in default to offer foreclosure consulting services.

*Id.* § 7-301(c)(1).

A "foreclosure consultant" may not induce, or attempt to induce, any homeowner to enter into a foreclosure consulting contract that does not comply in all respects with the law. Md. Code Ann., Real Property § 7-307. Though PHIFA does have an exception for licensed settlement agents, the exception only applies to those title insurance producers who are "acting

27

in accordance with the person's license." *Id.*  Thus, those settlement agents who are "performing services that are *not* in accordance with their license are not entitled to an exemption from PHIFA." *Massey v. Lewis*, No. AMD-08-261, (D. Md. Feb. 24, 2009) (Davis, J.)  Mem. Op. & Order at 5.

In a factually similar case in the summary judgment context, Judge André Davis of this Court found that the settlement agent who prepared the fraudulent HUD-1 form and that agent's settlement company were "foreclosure consultants" under the PHIFA.  *Id.*  The foreclosure rescue scam in that case also involved straw buyers who would help distressed homeowners secure refinanced lower-rate mortgages and permit those homeowners to remain in their homes as "tenants" who would then send "rent" checks to the straw buyer to cover the purported new mortgage payment, when in actuality that money was being siphoned off to the defendants.  *Id.* at 1-3.  The HUD-1 forms and other settlement and title documents had misrepresented to whom payments and fees were made.  *Id.*  The plaintiffs in that case did not receive the required "Notice of Rescission" from the settlement agent nor did the contracts include any reference to the homeowners' right to rescind.  *Id*. at 3.

Judge Davis, who cited this Court's earlier *Proctor* opinion multiple times, found that the settlement agent and the settlement company were subject to PHIFA because they "performed services beyond the scope of their license when they misappropriated funds" from the settlement as demonstrated by the discrepancy between what the HUD-1 form provided would be paid to the Plaintiffs ($1,365.50 more than what was paid) and what was actually paid to the Plaintiffs. *Id.* at 5.  Judge Davis then found that the settlement agent and the settlement company were "foreclosure consultants" because they provided the settlement services for a foreclosure reconveyance, in which they arranged for the plaintiff to reside in her home as a tenant and they

helped to create documentation that "clogged" the equity of redemption in plaintiff's home.  *Id.* at 6.

In so finding, Judge Davis explicitly addressed and rejected the defendants' contention that they had no knowledge that the property transfer was a "foreclosure reconveyance." Reviewing the factual record before him on summary judgment, Judge Davis found that the defendants had knowledge because they ordered a check of the title, asked plaintiff to provide a "new" address for the HUD-1, and they never gave plaintiffs any of the documents they signed. *Id.* at 7.  Judge Davis then granted summary judgment in the plaintiff's favor.  *Id.* at 8.

The Court will apply a similar analysis here.  The Second Amended Complaint alleges sufficient facts in support of the allegation that both Chaudhry and Farahpour were "foreclosure consultants" under PHIFA and thus subject to its requirements of providing homeowners with a "foreclosure contract." Specifically, the Second Amended Complaint alleges that they solicited homeowners indirectly (at the very least) and made representations that resulted in the clogging of the equity of redemption in the plaintiffs' properties.  Both Chaudhry and Farahpour, similar to the settlement agent, provided settlement services for a foreclosure reconveyance scheme, in which they received many valuable referrals, and they helped created documentation (i.e. either by preparing themselves or supervising Ballesteros's preparation of the fraudulent HUD-1s that siphoned off the equity from the named Plaintiffs' homes).  Sussex Title was under the management and control of Chaudhry and Farahpour, and Sussex Title recorded encumbrances against the Proctor property before the right to rescind had expired.  Second Am. Compl. ¶¶ 16-17, 23, 62 104, 105, 298(b)-(c).  These encumbrances were recorded along with a check for fees signed by Chaudhry.  Second Am. Compl. ¶ 104.  Furthermore, the Second Amended Complaint alleges that Farahpour was aware of problems with MMS, which was involved in the Plaintiffs'

transactions, in November 2005, which was before the Proctor Family transaction, yet did not advise the Proctors or the other class members or take any steps to avoid or correct the problem. Second Am. Compl. ¶ 77(e).  Moreover, Sussex Title ordered a title abstract that demonstrated that the Proctor property was in foreclosure *before* the settlement.  Second Am. Compl. ¶¶ 98-99.

The Court finds that the Plaintiffs have stated a claim under PHIFA because the Second Amended Complaint has alleged that the defendants had knowledge of the status of the properties they were settling (i.e. that they were in foreclosure), Chaudhry and Farahpour were aware of the mortgage foreclosure rescue scam, they then falsified HUD-1 statements to "clog" the equity of redemption in plaintiffs' properties (i.e. by recording the encumbrances against their properties before the time for rescission had expired), and by never giving plaintiffs any of the required documents regarding their right to rescind.

### D.       Count VI: Gross Negligence

Finally, Chaudhry and Farahpour contend that Plaintiffs have failed to state a claim against them for gross negligence because they have failed to allege the basis of the tort duties towards them.

Under Maryland law, a gross negligence claim requires a plaintiff to prove that the defendant intentionally failed to perform a duty in reckless disregard of its consequences to the life or property of another.  *See Marriott Corp. v. Chesapeake & Potomac Tel. Co. of Maryland*, 124 Md. App. 463, 478 (1998).

A review of the Second Amended Complaint demonstrates that Plaintiffs have pleaded multiple duties that they contend Chaudhry and Farahpour owed them.  The vast majority of these allegations appear for the first time in the Second Amended Complaint in an apparent

30

attempt to remedy the lack of specificity of the FAC, which the Court identified.  The duties that

Chaudhry and Farahpour are alleged to have breached are as follows:

- A duty to review the settlement and title documents that contained inconsistencies that should have put Chaudhry on notice on the illegal nature of the transactions. Second Am. Compl. ¶ 45.
- A duty stemming from their status as the owner/supervisor of a Maryland licensed title company to not engage in illegal settlement transactions.  Second Am. Compl. ¶ 152.
- A duty to exercise due diligence to determine that the transactions of Named Plaintiffs and the other members of the Class describe herein were not illegal in violation of the PHIFA (in the case of the Proctors and Maryland Subclass members), in violation of other law, or otherwise irregular. Second Am. Compl. ¶ 318.
- Duties to inquire into the nature of the transactions of Plaintiffs and the other members of the Class due to the facts that (a) the properties of certain Named Plaintiffs Proctors and other Maryland Subclass Members were residences in foreclosure under the PHIFA, (b) Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and F & F, were repeatedly involved in transactions involving residences in foreclosure, (c) Ms. Jackson, Ms. McCall, Mr. Fordham, Metropolitan and F & F were repeatedly using their straw purchasers to obtain interests in the properties of Plaintiffs and other members of the Class, and (d) the disbursements of funds shown on the HUD-1 did not comport with reality and Chaudhry and Farahpour had knowledge of those facts, or should have known of those facts, or willfully blinded themselves to those facts.  Second Am. Compl. ¶ 318.
- A duty to conduct due diligence inquiries into the transactions of the Plaintiffs and other class members to determine the legitimacy of the transactions, particularly the accuracy of the HUD-1 forms that Chaudhry and Farahpour prepared or which were prepared under the supervision of Chaudhry and Farahpour.  Second Am. Compl. ¶ 319-20.
- A duty to flag the transactions of the Plaintiffs and other class members as violative of PHIFA when applicable due to their knowledge that the residences of certain named Plaintiffs and other class members were in foreclosure.  Second Am. Compl. ¶ 319-20.
- A duty to refuse to settle the transactions of the Plaintiffs and other class members when they had actual and/or constructive notice of the irregularities and illegalities in the transaction due to the HUD-1 and other settlement and title documents.  Second Am. Compl. ¶ 319-20.
- A duty to oversee Ballesteros, who was their employee working under their supervision and receiving payment for tasks he performed for their benefit and the benefit of their company.  Second Am. Compl. ¶ 324.

- A duty to not employ Ballesteros after becoming aware that he was engaged in transactions where he took unearned fees, provided false information in connection with loans, failed to notice that persons were making false statements in connection with loan applications and other documents to obtain loans. Second Am. Compl. ¶ 324.
- A statutory duty not to "convert or misappropriate money received or held in escrow" under Maryland Insurance Article § 10-121(a). Pls.' Opp. at 44.

A tort claim for negligence, including gross negligence, is subject to the general pleading standard of Rule 8(a)(2), not the heightened "plead with particularity" standard associated with fraud allegations required under Rule 9(b).  *See Baltimore County,* 238 Fed. Appx. at 921 (holding that the "notice pleading" standard of Fed. R. Civ. P. 8 applies to allegations of non-fraudulent conduct and thus plaintiff's claim of negligent misrepresentation did not need to be pleaded with particularity under Fed. R. Civ. P. 9(b)).  While "bald and conclusory allegations" will not suffice to state a claim for gross negligence, Plaintiffs have provided the requisite degree of specificity under a "notice pleading" standard because Plaintiffs have outlined numerous irregularities in the settlement and title documents in addition to the manner in which money was transferred among the parties with an explanation of each Defendant's roles in the scheme. Ballesteros is alleged to have signed and/or prepared these fraudulent documents under the direction and supervision of Chaudhry and Farahpour, who are alleged to have, as a result of their expertise, licenses, and position, violated their duties to the Plaintiffs by permitting these fraudulent documents to be used in conjunction with real estate settlements involving the Plaintiffs.

The Court finds that Plaintiffs have pleaded their gross negligence claim with the requisite degree of specificity under Rule 8(a)(2).[8]

## IV.  Plaintiffs' Motion to Dismiss Counterclaims Filed by Alexander Chaudhry and Ali Farahpour [Paper No. 171]

Chaudhry and Farahpour filed counterclaims against the Plaintiffs for fraud, fraudulent concealment, negligent misrepresentation, fraudulent misrepresentation, and civil conspiracy to commit mortgage fraud. These counterclaims were filed on January 22, 2009, which is 548 days after this litigation commenced. [Paper No. 171].  Plaintiffs have moved to dismiss or strike the counterclaims on the basis that they are barred by the doctrines of res judicata and/or collateral estoppel.

The doctrine of res judicata, which is also known as claim preclusion, is that a prior judgment bars the re-litigation of claims that were raised or could have been raised in the prior litigation between the same parties. *The Pittston Co. v. United States*, 199 F.3d 694, 704 (4th Cir.1999).  Under Maryland law, res judicata requires proof of three elements: "(1) the parties in the present litigation [must] be the same or in privity with the parties to the earlier case; (2) the second suit must present the same cause of action or claim as the first; and (3) in the first suit, there must have been a valid final judgment on the merits by a court of competent jurisdiction." *Colandrea v. Wilde Lake Cmty, Ass'n*, 361 Md. 371, 389, 761 A.2d 899, 908 (2000) (quoting *deLeon v. Slear*, 328 Md. 569, 580, 616 A.2d 380, 385 (1992)).

Here, all three elements are present and the counterclaims of Chaudhry and Farahpour are barred as a matter of law. First, Chaudhry and Farahpour filed a lawsuit against the Proctors'

---

[8]Chaudhry and Farahpour contend that a higher degree of specificity is required to be pleaded for a request for punitive damages for a gross negligence claim under Maryland law.  *See Scott v. Jenkins*, 690 A.2d 1000, 1008 (Md. 1997). While that may be true for such a claim brought in state court, because this suit is in federal court, federal rules of civil procedure apply even when the substance of the claim is based upon state law. *See Hanna v. Plumer*, 380 U.S. 460, 465 (1965) (holding that federal courts sitting in diversity must apply state substantive law and federal procedural law).

attorneys arising from the transactions that form the basis of this litigation in the Circuit Court

for Montgomery County on June 18, 2008 for the same or substantially similar claims they now

assert against the Plaintiffs.   Though the Plaintiffs were technically not parties to the claims in

that state court action, Maryland courts have declined to require that the party asserting res

judicata be a party in the first suit where, as here, the party against whom res judicata is asserted,

"deliberately select[ed] his forum and there unsuccessfully present[ed] his proofs."   Here,

Chaudhry and Farahpour received a full and fair opportunity in state court to present their claims

regarding the propriety of the Plaintiffs' actions in this Court (before their  voluntary dismissal

with prejudice), but chose not to join the Plaintiffs as defendants in their state court action.

Therefore, the Court concludes that, for the purposes of res judicata, the Plaintiffs are in privity

with their attorneys in the Montgomery County case.  *See Jones v. Fisher Law Group, PLLC,*

334 F.Supp.2d 847, 851 (D. Md. 2004) (Titus, J.) (holding that counsel was in privity with the

defendants in two consolidated state cases even though counsel was not a party in the state cases

because counsel had acted in the capacity of counsel for the defendants in those cases and the

plaintiff in that state case chose not to join counsel).

Moreover, Chaudhry and Farahpour are attempting to relitigate the same claims here as

in their state court case.  The proper inquiry is whether the claims asserted in this action "could

have been litigated in the first suit."  *Id.*  In the state action, Chaudhry and Farahpour sought to

recover damages to their business and reputation, *inter alia*, resulting from the litigation of this

case and the claims asserted by the Plaintiffs against them.   These are the identical damages

sought here as the result of the same conduct. "When a valid and final judgment rendered in an

action extinguishes the plaintiff's claim pursuant to the rules of merger or bar (see §§ 18, 19) the

claim extinguished includes all rights of the plaintiff to remedies against the defendant with

respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *deLeon*, 616 A.2d at 380 (quoting Restatement (Second) of Judgments § 24 (1982)). Such an inquiry requires the Court to consider whether the facts of each case "are related in time, space, origin or motivation." *Id.* at 590, 616 A.2d 380. Here, the claims of Chaudhry and Farahpour in both the federal and state courts arose out of the same transaction: their professional involvement in the settlement of the Plaintiffs' properties.  Therefore, under the transaction test, the second element of res judicata has been met.

Finally, there was a valid final judgment on the merits. A dismissal with prejudice is a final adjudication of the matters asserted.  Md. Rule 2-506; *see also Claiborne v. Willis*, 702 A.2d 292, 297 (1997) ("a voluntary dismissal has the same res judicata effect as a final adjudication on the merits favorable to the defendant.") (citation omitted).  In the state case, Chaudhry and Farahpour, through the same counsel who is representing them in this matter, signed and filed a "Motion to Enter Voluntary Dismissal" that requested the Circuit Court for Montgomery County to dismiss that state litigation with prejudice.  *See* [Paper No. 155].  Thus, the Maryland court decision was a final judgment.

Therefore, because the counterclaims of Chaudhry and Farahpour are barred by res judicata, the Court will grant Plaintiffs' Motion to Dismiss Counterclaims.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court concludes that the Second Amended Complaint states a claim while the Counterclaims filed by Chaudhry and Farahpour do not the case will now be permitted to proceed as a class action.


Date: August 13, 2009                           _____/s/_____
                                                Roger W. Titus
                                                United States District Judge

36